USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_08/26/2019_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
                                   :

ERNESTO A. CABA RODRIGUEZ,      :
                                   :

            Plaintiff,        :          **OPINION & ORDER**
                                   :

          -against-        :         18-cv-05238 (KHP)
                                   :

NANCY A. BERRYHILL,           :
                                   :

            Defendant.     :
                                   :
----------------------------------------------------------------X

**KATHARINE H. PARKER, United States Magistrate Judge**.

      Plaintiff Ernesto A. Caba Rodriguez ("Plaintiff" or "Plaintiff Rodriguez"), who is represented by counsel, commenced this action against Defendant Nancy A. Berryhill[1] (the "Commissioner") pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g).  Plaintiff applied for disability insurance benefits ("DIB") on September 25, 2013.  He now seeks review of the Commissioner's decision that he was not disabled under Sections 216(i) and 223(d) of the Act from November 17, 2012, his alleged onset date, through June 30, 2014, the date he was last insured.

      Plaintiff and the Commissioner each filed Cross-Motions for Judgment on the Pleadings. (Doc. Nos. 9 ("Pl.'s Br."), 15 ("Def.'s Br."), and 21 ("Pl.'s Reply").)  Although Plaintiff initially claimed that he suffers from both disabling mental and physical impairments, he now only appeals Administrative Law Judge ("ALJ") Mark Solomon's findings concerning his mental

---

[1] Plaintiff commenced this case against Nancy A. Berryhill, the then-acting Social Security Commissioner.  Andrew M. Saul was appointed Commissioner on June 17, 2019.

impairments and the limitations purportedly caused by them. (Pl.'s Br. 2 n.5.) Accordingly, this Opinion will only analyze Plaintiff's claim with respect to his purported mental impairments.

The first issue before this Court is whether ALJ Solomon properly weighed the medical opinion evidence in the record and, specifically: the report prepared by Plaintiff's treating psychiatrist, Dr. Raymond Tam; the opinions of consultative examiners Drs. Toula Georgiou and Michael Kushner; the testimony provided by Dr. Edward N. Halperin; and the opinion of Dr. S. Shapiro, a non-examining source. The second issue before this Court is whether the ALJ properly evaluated Plaintiff's testimony regarding his symptoms. For the reasons set forth below, the Commissioner's Motion is GRANTED and Plaintiff's Motion is DENIED.

## BACKGROUND

### I. *Summary of Claim and Procedural History*

Plaintiff Rodriguez is 51 years old and lives with his wife and two young daughters in an apartment in New York City. (Administrative Record ("Tr.") 231, 1066, 1069.) He was born in the Dominican Republic and moved to the United States when he was seven years old. (*Id*. at 493.) Plaintiff Rodriguez maintains that he has experienced auditory hallucinations since early childhood. (*Id*. at 41, 513, 1079.) He also recalls seeing a mental health specialist when he was around nine or ten years old because he would compulsively scratch his head until it would bleed. (*Id*. at 41, 514, 539.) However, Plaintiff Rodriguez reported that he did not continue seeing the specialist after that initial visit. (*Id*. at 514.)

Plaintiff attended school in New York City, where he was held back in multiple grades. (*Id*. at 60-62, 99, 493, 1066.) Although he was not enrolled in special education classes while he was attending school, Plaintiff claims he has a learning disability that makes it difficult for him

to read, write, and remember things. (*Id*. at 61-62.) Plaintiff Rodriguez stopped attending school after completing the sixth grade, when he was approximately 16 years old. (*Id*. at 41, 61-62, 99, 493, 1066.) Plaintiff testified that he stopped attending school after his girlfriend became pregnant and his mother sent him to live in the Dominican Republic for a year. (*Id*. at 99.) He explained that, by the time he returned to the United States, he had completely lost interest in school and did not attempt to reenroll. (*Id*. at 99; *see also* 41, 61-62, 99, 493, 1066.) Plaintiff estimates that he reads and writes at a second grade level. He has difficulty reading the newspaper, filling out job applications, and uses voice recognition software to surf the internet. (*Id*. at 1066, 1076; *see also id*. at 46-47, 1079.)

Plaintiff's work history spans approximately 15 years, from 1993 through around November of 2009. [2] (*Id*. at 355.) During that time Plaintiff held various jobs and was employed as a warehouse worker, cargo loader, janitor, and coffee maker. (*Id*. at 49-52, 85-86, 351, 355, 1105; *see also* Pl.'s Br. 2.) Plaintiff stopped working after he was let go from his job as a coffee maker as part of a group layoff. (Tr. 48-52, 85-86, 351, 355, 493, 516; *see also* Pl.'s Br. 2.) Although Plaintiff claims he attempted to find another job after he was laid off, he has been unable to secure gainful employment since 2009. (Tr. 85-86.) Plaintiff's then-girlfriend, who is now his wife, gave birth to their daughter shortly after Plaintiff lost his job. (*Id*. at 539.) Due to financial constraints, Plaintiff moved into a homeless shelter with his wife and baby daughter in or about 2010. Plaintiff lived in the shelter with his family for approximately four years, until they were finally able to move into the apartment where they currently reside. (*Id*. at 1068-69,

---

[2] Although Plaintiff trained to work at a Tyson meat processing facility in early 2010, he was ultimately unable to take the job because it required him to work on a high platform while cutting meat. Plaintiff alleges that he is scared of heights and has some vision problems that prevent him from performing that type of work. (*Id*. at 50; *see also* Pl.'s Br. 2.)

1094.)  Plaintiff's wife gave birth to another daughter shortly after they moved out of the homeless shelter.  (*Id*. at 1069, 1228.)

Plaintiff averred that he began experiencing  anxiety and an increased frequency of auditory hallucinations around the time he lost his job in 2009.  (*Id*. at 42, 521, 1071, 1076-78.) He began seeking mental health treatment at Long Island Consultation Center ("LICC") on December 21, 2011.  (*Id*. at 946, 1201; *see also* Pl.'s Br. 2.)  There, Plaintiff routinely attends weekly therapy sessions with Rachel Fiskus, a licensed master social worker ("LMSW"), and monthly sessions with psychiatrist Dr. Raymond Tam.  (Tr. 1076-77.)  Dr. Tam completed an initial psychiatric evaluation of Plaintiff on December 23, 2011.  (*Id*. at 539-40.)  During the evaluation, Plaintiff reported suffering from crying spells, poor sleep, feelings of guilt and hopelessness, and vague suicidal ideation, but denied having any plans to hurt himself.  (*Id*. at 539.)  He also averred that he suffers from forgetfulness and auditory hallucinations.  (*Id.*)  Dr. Tam opined that Plaintiff may have a learning disorder and hyperactivity and suffers from depression with psychotic features.  (*Id*. at 539-40.)  He also determined that Plaintiff had a Global Assessment of Functioning Score ("GAF")[3] of 55.  (*Id*. at 540.)  During that initial psychiatric assessment, Dr. Tam prescribed Plaintiff Celexa[4] and Risperdal.[5]  (*Id.*)

---

[3] "[GAF] is a scoring system that mental health professionals use to assess how well an individual is functioning in their daily lives." Rachel Nall, *What Does My GAF Score Mean?*, HEALTHLINE (Dec. 18, 2017), https://www.healthline.com/health/gaf-score.  A GAF score can range from 0 to 100.  A score between 51 and 60 indicates "[m]oderate symptoms, such as occasional panic attacks, or some difficulty in building meaningful social relationships."  *Id.*

[4] Also known by its generic name, citalopram, this is a selective serotonin reuptake inhibitor ("SSRI") used to treat depression.  *Citalopram (Oral Route)*, MAYOCLINIC.ORG (last visited Aug. 14, 2019), https://www.mayoclinic.org/drugs-supplements/citalopram-oral-route/description/drg-20062980.

Plaintiff continued to attend regular sessions with Dr. Tam and LMSW Fiskus to treat his depression, anxiety, and auditory hallucinations. Dr. Tam and LMSW Fiskus maintained contemporaneous notes of their meetings with Plaintiff, starting with their initial meetings in December of 2011, through December of 2016 (collectively, the "LICC Treatment Notes"). The Notes show that the psychotropic medications Dr. Tam prescribed improved Plaintiff's mood, helped alleviate his depression, and reduced the frequency and intensity of his auditory hallucinations. (*Id*. at 551, 553-54, 547, 1207.) Although Plaintiff reported having fewer auditory hallucinations when he is less stressed (*id*. at 544), he also stated that he sometimes experiences increased auditory hallucinations, anxiety, and depression due to various psycho-social stressors,[6] including: strained family relationships (*id*. at 542, 548-50, 552, 672, 676-77, 679, 681); his mother's death (*id*. at 542; *see also id*. at 547, 641, 665, 669, 672-77, 679, 681, 683-84); concerns regarding his finances and housing situation (*id*. at 545, 548-49, 641, 659, 665, 673-76, 679, 683-84, 994); and anxiety and frustration arising from his attempts to improve his reading and math skills. (*Id*. at 461, 544, 550, 669, 674; *see also id*. at 461, 1222; Pl.'s Br. 3.)

On May 29, 2013, LMSW Fiskus wrote a letter documenting that Plaintiff was working to improve his reading and math skills in order to find gainful employment and had been attending therapy for the last 16 months to treat his depression and anxiety. (Tr. 950.) Dr. Tam also wrote a letter on August 13, 2013 stating that Plaintiff suffers from depression and an

---

[5] This drug is used to treat mood disorders such as schizophrenia, bipolar disorder, and irritability associated with autism. *Risperdal*, WEBMD (last visited Aug. 14, 2019), https://www.webmd.com/drugs/2/drug-9846/risperdal-oral/details.

[6] On the standard form used to document the LICC Treatment Notes, the term "psycho-social stressors" typically refers to situations involving educational, occupational, housing, financial, and legal problems. (*E.g.*, *id*. at 441.)

unspecified learning disorder and was "unable to work in community based employment." (*Id*. at 948.)

Plaintiff applied for DIB benefits on September 25, 2013 and asserted a disability onset date of November 1, 2009 and a date last insured of June 30, 2014. (*Id*. at 231-32; Pl.'s Br. 1.) In his application, Plaintiff alleged that he suffers from schizophrenia, memory loss, and depression. (Tr. 230-33, 256; Def.'s Br. 2.) Plaintiff enrolled in GED classes in September of 2013 (Tr. 461, 544, 550, 669, 674; *see also id*. at 461, 1222; Pl.'s Br. 3) and began working part-time at a synagogue as part of the "WeCare Fedcap" Program[7] in August of 2013. (Tr. 647.)

On February 14, 2014, Dr. Toula Georgiou, a psychologist contracted by the New York State Division of Disability Determinations, conducted a consultative examination of Plaintiff. (*Id*. at 493-69.) Plaintiff reported being able to dress, bathe, and groom himself, do simple cooking, and use public transportation. (*Id*. at 495.) He averred that he suffers from interrupted sleep and depressive symptoms, including dysphoric mood, loss of interest, loss of pleasure, and fatigue, and "occasional auditory hallucinations." (*Id*. at 492-93.) Plaintiff did not report cognitive symptoms, and Dr. Georgiou opined that Plaintiff does not have a learning disorder. (*Id.*) Although Plaintiff denied having suicidal thoughts at the time of the examination, he reported experiencing such thoughts around the time of his mother's death in December of 2013. (*Id*. at 493.) Dr. Georgiou determined that Plaintiff's memory skills are mildly impaired, that his cognitive functioning is average, and that his insight and judgment are fair. (*Id*. at 494-95.) She opined that Plaintiff suffers from mild depression with psychotic

---

[7] The WeCare Program aims to help individuals with mental and physical impairments to, among other things, achieve the highest level of self-sufficiency possible by helping them find employment. *See WeCare*, FEDCAP.ORG (last visited Aug. 14, 2019), https://www.fedcap.org/content/wecare.

features.  (*Id*. at 495.)  Dr. Georgiou concluded that the results of the examination appeared "consistent with psychiatric difficulties that may interfere with . . . [Plaintiff's] ability to function on a daily basis"  and that Plaintiff's prognosis was "fair" given his symptoms and psychiatric history.  (*Id.*)

On February 27, 2014, Psychologist S. Shapiro, a non-examining state agency medical consultant, reviewed medical evidence in the record, including Dr. Georgiou's report, the available LICC Treatment Notes, and Plaintiff's self-reported symptoms and activities of daily living, to evaluate Plaintiff's alleged impairments arising from his alleged schizophrenia, memory loss, and depression.  (*Id*. at 117-20, 122-25.)  In assessing Plaintiff's purported impairments, Dr. Shapiro noted that Plaintiff had not been hospitalized and had no documented episodes of decompensation.  (*Id*. at 122, 125.)  Dr. Shapiro also observed that Plaintiff's impairments were exacerbated by certain stressors, including his mother's recent death, his unsuccessful attempts to move out of the homeless shelter, his interpersonal conflicts with his family, and his attempts to improve his reading ability.  (*Id*. at 125.)  Additionally, Dr. Shapiro noted that Plaintiff suffers from occasional mild auditory hallucinations and that, although Plaintiff had thought about suicide around the time of his mother's death, he was not planning to hurt himself.  (*Id.*)

Dr. Shapiro concluded that Plaintiff is not significantly limited with respect to: his memory; most areas pertaining to social interaction; and his ability to adapt to workplace settings. (*Id*. at 124.)  Furthermore, Dr. Shapiro opined that Plaintiff has mild limitations in carrying out his activities of daily living and maintaining concentration, persistence and pace. (*Id.*)  Finally, Dr. Shapiro concluded that Plaintiff has moderate limitations in his ability to:

understand and remember detailed instructions; interact with the general public; and set realistic goals and make plans independently.  (*Id.*)

Following the initial review of his DIB application, the Commissioner denied Plaintiff's claim on March 4, 2014.  (*Id*. at 152-59; Pl.'s Br. 1.)  On or about June 16, 2014, LMSW Fiskus wrote another letter on Plaintiff's behalf, opining that Plaintiff could not work due to mental impairments arising from anxiety and depression.  (Tr. 949.)  Dr. Tam wrote a similar letter dated June 24, 2014, where he stated that Plaintiff is unable to work due to his mental impairments.  (*Id*. at 946.)  Plaintiff requested, and was granted, a hearing before an ALJ, which took place on September 15, 2014.  (*Id*. at 27-76; Pl.'s Br. 1.)  He also amended his disability onset date to November 17, 2012.[8]  (Tr. 250; Pl.'s Br. 1.)  The presiding ALJ denied Plaintiff's DIB claim on April 29, 2015.  (Tr. 8-26; Pl.'s Br. 1.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council, and the appeal was denied on July 29, 2015.  (Tr. 1-6, 1118-19; Pl.'s Br. 1.)  On September 15, 2015, Plaintiff commenced a civil action appealing the Appeals Council's decision in the District Court for the Southern District of New York (Tr. 1118-19; Pl.'s Br. 1), and the parties subsequently stipulated to remand the case for a new hearing and decision.  (Tr. 1120; Pl.'s Br. 1.)  On July 19, 2016, the Appeals Council issued an Order requiring the ALJ to: (1) adequately evaluate all of the opinion evidence in the record and provide the reasoning underlying the weight given to those opinions; (2) evaluate all of Plaintiff's subjective complaints; and (3) reevaluate Plaintiff's

---

[8] Plaintiff filed an earlier DIB application, which was denied by an ALJ on November 16, 2012 (Tr. 129-150) and the denial was affirmed by the Appeals Council.  Accordingly, Plaintiff concedes that he has an administratively imposed onset date of November 17, 2012 based on the doctrine of *res judicata*.  (Pl.'s Br. 1 n.3.)

residual functional capacity ("RFC"), that is, the most work Plaintiff can perform despite his limitations.  (Tr. 1115-16); *see also* 20 C.F.R. § 404.1520(e).

On October 3, 2016, over two years after Plaintiff's date last insured, Dr. Michael Kushner, a psychologist contracted by the New York State Division of Disability Determination, examined Plaintiff to evaluate his mental impairments.  (Tr. 1172-75.)  Following the examination, Dr. Kushner opined that Plaintiff's cognitive functioning is below average and that he has a limited fund of information.  (*Id*. at 1174.)  He also found that Plaintiff suffers from mild limitations in his ability to: understand and remember simple instructions; carry out simple instructions; and make judgments on simple work-related decisions.  (*Id*. at 1176.)  Additionally, Dr. Kushner concluded that Plaintiff suffers from moderate-to-marked limitations in his ability to: understand, remember, and carry out complex instructions; make judgments on complex work-related decisions; interact appropriately with the public, supervisors, and co-workers; and respond appropriately to usual work situations and to changes in a routine work setting.  (*Id*. at 1176-77.)

On January 5, 2017, Dr. Tam prepared a mental impairment questionnaire (the "Dr. Tam Report") finding that Plaintiff suffers from major depression with psychotic features and an unspecified learning disorder.  The Report also noted that Plaintiff is taking Celexa and Latuda.[9] (*Id*. at 1201-1205.)  Dr. Tam opined that Plaintiff exhibits moderate[10] limitations in:

---

[9] This medication is used to treat mood disorders such as schizophrenia and depression.  *Latuda*, WEBMD (last visited Aug. 15, 2019), https://www.webmd.com/drugs/2/drug-155134/latuda-oral/details.  The Report also noted that Plaintiff stopped taking Risperdal and Seroquel in October of 2015 due to unspecified side effects.  (*Id*. at 1201.)

[10] The term "moderate," as used in the Report, indicates that symptoms will interfere with Plaintiff's ability to work for up to one-third of the eight-hour workday.  (*Id*. at 1204.)

remembering locations and work-like procedures; understanding, remembering, and carrying out one-to-two step instructions; asking simple questions or requesting assistance; maintaining socially appropriate behavior; and adhering to basic standards of neatness. (*Id*. at 1204.) Dr. Tam also concluded that Plaintiff has moderate-to-marked[11] limitations in his ability to: adhere to a schedule; maintain an ordinary routine without supervision; work with others without being distracted; make simple work-related decisions; complete a workday without interruptions from psychological symptoms; perform at a consistent pace without rest periods of unreasonable length or frequency; get along with coworkers without distracting them; respond appropriately to workplace changes; and be aware of hazards and take appropriate precautions. (*Id.*) Further, Dr. Tam found that Plaintiff has marked[12] limitations in his ability to: understand, remember, and carry out detailed instructions; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; and set realistic goals. (*Id.*)

Plaintiff attended an in-person hearing before ALJ Solomon on January 13, 2017. (*Id*. at 1060-1112; Pl.'s Br. 1-2.) At the hearing, Plaintiff testified that he lives with his wife and two young daughters and takes care of the children while his wife is at work. (Tr. 1070-71, 1075, 1080.) He also stated that he is able to groom and bathe himself, cook simple meals, clean, and go grocery shopping every two weeks. (*Id*. at 1070, 1072-73.) Plaintiff averred that he began taking GED classes in 2013 and attended classes five days per week for three or four hours per

---

[11] The term "moderate-to-marked," as used in the Report, indicates that symptoms may interfere with Plaintiff's ability to work for one-third to two-thirds of the eight-hour work day. (*Id.*)

[12] The term "marked," as used in the Report, indicates that Plaintiff's symptoms will interfere with his ability to work for more than two-thirds of the eight-hour workday. (*Id.*)

day for approximately two years.  (*Id*. at 1067-68, 1078; *see also id*. at 62-63, 544.)  Although

Plaintiff took the GED exam twice, he was unable to pass the exam and did not receive a

degree.  (*Id*. at 1067-68, 1078.)

Psychiatrist Dr. Edward N. Halperin testified as a medical expert during the hearing.

Although Dr. Halperin did not have access to Dr. Tam's Report or over two years of treatment

records post-dating Plaintiff's date last insured, he nevertheless opined that Plaintiff's mental

impairments equaled the severity of the impairments listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (§ 404.1520(d), § 404.1525, and § 404.1526) (the "Listings") and, specifically, Listing

12.04, which pertains to depressive, bipolar, and related disorders.  (*Id*. at 1093-95, 1097, and

1103.)  To support this conclusion, Dr. Halperin cited to Plaintiff's reported anhedonia,[13]

feelings of guilt, difficulty concentrating, auditory hallucinations, and diagnosed

schizophrenia.[14]  (*Id*. at 1092-93.)  Dr. Halperin further opined that Plaintiff has moderate

limitations in: understanding, remembering, and applying information; interacting with others;

maintaining concentration, persistence, and pace; and adapting and managing himself.  (*Id*. at

1102.)

A vocational expert also testified at the hearing and found that an individual of

Plaintiff's age, education, and work history who can perform simple, repetitive work while

having limited close interpersonal contact with supervisors and co-workers and no close

---

[13] "Anhedonia refers to the reduced ability to experience pleasure . . . ."  Philip Gorwood, *Neurobiological Mechanisms of Anhedonia*, NCBI (Sept. 2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3181880/.

[14] As explained *infra*, the record does not contain a schizophrenia diagnosis.

interpersonal contact with the public can perform the following jobs requiring light[15] strength:

marker (DOT No. 209.587-034); routing clerk (DOT No. 222.687-022); and office helper (DOT

No. 239.567-010).  (*Id*. at 1107.)  The vocational expert also opined that Plaintiff can perform

the following sedentary[16] jobs: addresser (DOT No. 209.587-01); assembler (DOT No. 734.687-

018); table worker (DOT. No. 739.687-182); and stuffer (No. 731.685-014).  (*Id*. at 1108-1109.)

In response to hypotheticals posed by the ALJ, the vocational expert further opined that

Plaintiff would be unable to maintain any of these jobs if: he was off task for more than 15

percent of the eight-hour work day; could not have any interpersonal contact with supervisors,

coworkers, and the general public; could not accept instructions and respond appropriately to

criticism from supervisors; and could not adapt to the normal stress of the workplace.  (*Id*. at

1109-11.)

   By decision dated May 22, 2017, ALJ Solomon found that Plaintiff was not disabled from

November 17, 2012 through June 30, 2014, Plaintiff's date last insured.  (*Id*. at 1008-32; Pl.'s Br.

2.)  A summary of his decision follows.

---

[15]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

[16] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." § 404.1567(a).

*II.    The Commissioner's Decision*

To start, ALJ Solomon found that Plaintiff meets the insured status requirements of the

Social Security Act through June 30, 2014.  (Tr. 1011.)  He then followed the five-step sequential

analysis contemplated in the governing regulations to make his RFC ruling.  *See* 20 C.F.R. §

404.1520(a).  At step one, the ALJ found that Plaintiff did not engage in substantial gainful

activity from the alleged disability onset date, November 17, 2012, through June 30, 2014, the

date last insured.  (Tr. 1014); *see also* § 404.1571.  At step two, ALJ Solomon found that Plaintiff

suffered from major depressive  disorder with psychotic features.  (Tr. 1014); *see also* §

404.1520(c).

At step three the ALJ found that Plaintiff's impairments, considered both individually

and collectively, fail to meet or medically equal the severity of the impairments set forth in the

Listings.  (Tr. 1014); *see also* 20 C.F.R. Part 404, Subpart P, Appendix 1 (§§ 404.1520(d),

404.1525 and 404.1526).  When evaluating Plaintiff's degree of limitation resulting from his

alleged mental impairments, ALJ Solomon looked to Sections 12.03 (schizophrenia spectrum

and other psychotic disorders), 12.04 (depressive, bipolar and related disorders), and 12.06

(anxiety and obsessive-compulsive disorders) of the Listings.  (Tr. 1015.)  Pursuant to these

sections, a claimant meets the Listings when they meet the criteria for both Paragraphs A and B

or when they meet the criteria for both Paragraphs A and C.  Part 404, Subpart P, Appendix 1

(12.00 Mental Disorders).

The ALJ's decision did not address whether Plaintiff satisfied the criteria in Paragraph A,

which pertains to the medical criteria that must be present in the medical evidence provided by

the claimant.  The ALJ did, however, analyze the criteria in Paragraph B. To meet the criteria

under this Paragraph, the claimant's mental impairments must result in an "extreme" limitation

of one, or "marked" limitation of two, of the four areas of mental functioning: "Understand,

remember, or apply information; interact with others; concentrate, persist, or maintain pace;

and adapt or manage oneself." *Id.*

ALJ Solomon concluded that Plaintiff has, at most, some mild or moderate limitations

under the criteria in Paragraph B. (Tr. 1015-16.) With respect to Plaintiff's ability to

understand, remember, or apply information, the ALJ noted that there is no evidence showing

that Plaintiff has a diagnosed learning disorder. He also considered Dr. Georgiou's February 14,

2014 examination, which showed that Plaintiff has mild memory impairments and average

cognitive functioning. (*Id*. at 1015; *see also id*. at 493-96.) ALJ Solomon also noted that Plaintiff

has an extensive history of performing unskilled work and neither the medical evidence in the

record nor Plaintiff's testimony suggest that Plaintiff's mental limitations increased after he

stopped working. (*Id*. at 1015.)

Additionally, the ALJ found that, although evidence in the record shows that Plaintiff has

some limitation in his ability to interact with others, the record also reflects that Plaintiff is able

to travel and shop independently and attend classes. (*Id*. at 1016; *see also id*. at 461, 544, 550,

669, 674, 1222.) Furthermore, with respect to maintaining concentration, persistence, and

pace, the ALJ concluded that the LICC Treatment Notes fail to show that Plaintiff is unable to

focus, has difficulty concentrating, or is unable to complete tasks. (*Id*. at 1016.) Finally, with

respect to adapting and managing himself, ALJ Solomon noted that Plaintiff carries out his

activities of daily living independently, cares for his young children while his wife works, and

shops and travels independently. (*Id*.) Thus, the ALJ concluded that Plaintiff has the ability to

regulate his emotions and control his behavior in a work setting and, in light of the other evidence in the record, Plaintiff's mental impairments do not satisfy the Paragraph B criteria. (*Id.*)

ALJ Solomon also found that Plaintiff failed to meet the criteria of Paragraph C, which requires claimants to prove that their mental impairments are "serious and persistent" and have lasted for a period of at least two years. (*Id*.); *see also* Part 404, Subpart P, Appendix 1 (12.00 Mental Disorders). The ALJ reasoned that Plaintiff does not meet the Paragraph C criteria because the record did not show that Plaintiff is unable to adapt to changing environmental demands. (Tr. 1016.)

At step four, the ALJ found that Plaintiff retained the requisite RFC to perform light work, as defined in 20 C.F.R. 404.1567(b), with some limitations to accommodate his physical and mental impairments. (*Id*. at 1016-17.) With respect to Plaintiff's mental impairments, the ALJ provided the following limitations: Plaintiff "needed to avoid working at unprotected heights or with hazardous machinery, . . . could perform a full range of simple repetitive rote work but required a job with only occasional close interpersonal contact with supervisors or coworkers, and no close interpersonal contact with the general public." (*Id.*) In assessing Plaintiff's psychological functioning, ALJ Solomon emphasized that Plaintiff stopped working in 2009 due to a mass job lay off, not because of his alleged impairments. (*Id*. at 1018.) The ALJ also considered Plaintiff's various activities of daily living, as described above, and noted that although Plaintiff did not pass the GED exam, his reading and math skills nevertheless improved. (*Id*. at 1021.)

ALJ Solomon further noted that the LICC Treatment Notes show that the symptoms arising from Plaintiff's mental impairments improved over time with conservative treatment consisting of outpatient therapy and medication. (*Id*. at 1020-21.) Although the ALJ acknowledged that Plaintiff continued to report some anxiety, depression, "mini" auditory hallucinations and, at times, suicidal ideation, he reasoned that these symptoms were attributable to high-stress situations involving Plaintiff's housing, finances, his mother's poor health and death, and conflicts with his sister and other family members. (*Id*. at 1019.) ALJ Solomon also noted that the LICC Treatment Notes reflect that Plaintiff often exhibited a neutral and stable mood, appropriate affect, and was not psychotic even when he was dealing with these high-stress situations and experiencing aggravated symptoms. (*Id.*)

In determining Plaintiff's RFC, the ALJ also weighed the medical evidence in the record. The ALJ gave little weight to the May 2013 and June 2014 letters submitted by LMSW Fiskus and the August 2013 and June 2014 letters submitted by Dr. Tam because they were vague and conclusory. (*Id*. at 1023); *see also* 20 C.F.R. § 404.1527(d)(3). The ALJ also ascribed little weight to the October 2016 evaluation conducted by Dr. Kushner because his opinion was based on a one-time evaluation performed more than two years after Plaintiff's insured status had expired. (Tr. 1023.) Additionally, ALJ Solomon gave little weight to Dr. Halperin's opinion because it was "grossly disproportionate" to the treatment notes in the record and Plaintiff's ability to function on a daily basis. (*Id*. at 1022.) The ALJ also noted that, although Dr. Halperin testified that Plaintiff has diagnosed schizophrenia, the record does not include such a diagnosis. (*Id*. at 1022; *see also id*. at 1093.)

The ALJ ascribed partial weight to Dr. Georgiou's February 2014 evaluation of Plaintiff, to the extent she found that Plaintiff would have difficulty performing complex tasks and dealing appropriately with stress. (*Id.* at 1023.) In giving Dr. Georgiou's opinion only partial weight, ALJ Solomon reasoned that her opinion was based on a one-time evaluation, did not provide specific functional limitations or define the term "stress," and yielded substantially normal findings. (*Id.*) The ALJ also ascribed partial weight to the evaluation conducted by non-examining consultative examiner Dr. Shapiro on February 27, 2014, to the extent it showed that Plaintiff has the mental capacity to perform simple unskilled work. (*Id.*)

ALJ Solomon ascribed partial weight to Dr. Tam's 2017 Report because it identified moderate-to-marked and marked limitations that were not reflected in Dr. Tam's own contemporaneous treatment notes. (*Id.* at 1024.) Thus, to the extent Dr. Tam's Report was inconsistent with the LICC Treatment Notes, the ALJ ascribed greater weight to the Notes than the Report. (*Id.*) ALJ Solomon also rejected Dr. Tam's conclusion that Plaintiff has suffered from mental impairments since 2009 because Dr. Tam only began treating Plaintiff in 2011. (*Id.*) The ALJ gave some weight to Plaintiff's GAF score of 55, assessed in April of 2012, December of 2013, and March of 2014, to the extent those scores reflected Dr. Tam's and LMSW Fiskus's judgment that Plaintiff was stable and exhibited, at most, moderate symptoms or limitations during the time period at issue.[17] (*Id.*; *see also id.* at 432, 437, 521, 525, 540,

---

[17] "The Social Security Administration has explained that '[u]nless [a] clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.'" *Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (citing U.S. Soc. Sec. Admin., Office of Disability Programs, AM-13066, Global Assessment of Functioning (GAF) Evidence in Disability Adjudication (Oct. 14, 2014) (alteration in original)).

933.)  Finally, after reviewing the evidence in the record, the ALJ concluded that Plaintiff cannot perform his past relevant work.  (*Id*. at 1024.)

At step five of his analysis, the ALJ considered Plaintiff's age, education, RFC, and the vocational expert's testimony and found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (*Id*. at 1025-26.)  Thus, the ALJ held that Plaintiff was not disabled from November 17, 2012 through June 30, 2014, the date last insured.  (*Id*.)

## DISCUSSION

### I.  *Applicable Law*

#### A.  *Judicial Standard of Review of the Commissioner's Decision*

A court's review of an appeal of a denial of disability benefits is limited to two inquiries. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision.  42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).  Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record.  *Id.*  If the Commissioner's decision is supported by substantial evidence in the administrative record, the ALJ's findings as to any facts are conclusive.  § 405(g); *see also* 42 U.S.C. § 1383(c). An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure may have affected the disposition of the case.  *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR").  *See, e.g., id.* (regulation); *Schaal v. Callahan*, 993 F. Supp. 85, 93 (D. Conn. 1997) (SSR).  In such a case, the court may remand the matter to the

Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning. *See, e.g.*, *Crysler v. Astrue*, 563 F. Supp. 2d 418, 429 (N.D.N.Y 2008).

If the reviewing court is satisfied that the ALJ applied the correct legal standards, then it must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision . . . ." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (internal quotation marks and citations omitted). Under the substantial evidence standard, a reviewing court may reject an ALJ's findings of fact "only if a reasonable factfinder would have to conclude otherwise." *Id*. at 448 (internal quotation marks, citations, and emphasis omitted). This is a "highly deferential standard of review" and "if evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *Negron v. Berryhill*, 733 F. App'x 1, 2 (2d Cir. 2018) (internal quotation marks, citation, and alteration omitted).

To be supported by substantial evidence, the ALJ's decision must be based on a consideration of all the evidence available in the claimant's case record. 42 U.S.C. § 1383(c). While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (citation and internal quotation marks omitted), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Commissioner of Soc. Sec.*, 557 F.3d 79, 82–84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler*, 546 F.3d at 268–69 (overlooking

and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded treating physician evidence typically requires remand). If the decision denying benefits applied the correct legal standards and is based on substantial evidence, the reviewing court must affirm; otherwise, the court may modify or reverse the decision, with or without remand. §§ 405(g); 1383(c)(3).

### B. Legal Principles Applicable to the Commissioner's Disability Determination

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." §§ 423(d)(1)(A); 1382c(a)(3)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct a five-step inquiry. First, the ALJ must determine whether the claimant is currently engaged in any substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). Second, if the claimant is not gainfully employed, the ALJ must ascertain whether the claimant has a "severe" impairment that significantly limits his or her ability to perform basic work activities. Under the applicable regulations, an impairment or combination

of impairments that significantly limits the claimant's ability to perform basic work activities is considered "severe." § 404.1520(a)(4)(ii).

Third, if the claimant has a severe impairment, the ALJ must determine whether the impairment is identified in the Listings – if it is, the Commissioner will presume the claimant to be disabled and the claimant will be eligible for benefits. § 404.1520(a)(4)(iii). At this stage, the Commissioner also must determine the claimant's RFC — that is, his or her ability to perform physical and mental work activities on a sustained basis despite his or her impairments.[18] § 404.1520(a)(4)(iv), (e). Fourth, if the claimant does not meet the criteria for being presumed disabled, the Commissioner next must evaluate whether the claimant possesses the RFC to perform his or her past work. § 404.1520(a)(4)(iv).

Fifth, if the claimant is not capable of performing work he performed in the past, the Commissioner must determine whether he is capable of performing other work. § 404.1520(a)(4)(v); *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999). The claimant bears the burden of proof at the first four steps. *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). However at the last step, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998).

Where a claimant alleges mental impairments in connection with an application for disability benefits, the Commissioner also must assess those limitations pursuant to 20 C.F.R. § 404.1520a. This regulation requires the application of a "special technique" at the second and

---

[18] A claimant's residual functional capacity is "the most [he] can still do despite [his] limitations." § 404.1545(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* SSR 96-9P, 1996 WL 374185 (S.S.A. July 2, 1996) (clarifying that a claimant's residual functional capacity is his maximum ability to perform full-time work on a regular and continuing basis).

third steps of the five-step framework and at each level of administrative review. §

404.1520a(a); *Kohler v. Astrue*, 546 F.3d 260, 265–66 (2d Cir. 2008).  Thus, the Commissioner

must:

(1) Determine whether the claimant has "medically determinable mental impairment(s)";

(2) If the claimant has mental impairment(s), "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document . . . [those] findings";

(3) "[R]ate the degree of functional limitation resulting from the impairment(s)" by "consider[ing] all relevant and available clinical signs and laboratory findings, the effects of . . . [the claimant's] symptoms, and how . . . [his] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment";

(4) Consider "the extent to which . . . [the claimant's] impairment(s) interfere[] with . . . [his] ability to function independently, appropriately, effectively, and on a sustained basis" by considering among the following factors: "the quality and level of . . . [the claimant's] overall functional performance, any episodic limitations, the amount of supervision or assistance . . . require[d], and the settings in which . . . [he is] able to function"; and

(5) Rate the degree of functional limitation in the following broad areas of functioning: "Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself."  These areas are rated using a five-point scale: "one, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity."

§ 404.1520a(b)-(c).  If the degree of limitation is "none" or "mild, the Commissioner will

typically conclude that the claimant's impairments are not severe, unless contrary evidence

indicates more than a minimal limitation to complete basic work activities.  § 404.1520a(d)(1).

Where a claimant's mental impairments are severe, the Commissioner will determine if it meets or is equivalent in severity to a mental disorder set forth in the Listings. § 404.1520a (d)(2). The Commissioner accomplishes this task by comparing medical findings regarding the claimant's mental impairments and the rating of the degree of functional limitation to the criteria of the appropriate mental disorder. *Id.* Where a claimant has a mental impairment that is severe and neither meets nor is equivalent in severity to any Listing, the claimant's RFC will be assessed. § 404.1520a(d)(3).

## II. *Analysis*

Although the parties have identified two key issues on appeal, the Court has reviewed the entire record as part of its independent review process. Accordingly, the Court addresses additional issues below as part of its decision granting the Commissioner's Motion.

### A. *Development of the Record*

In Social Security proceedings, the ALJ must affirmatively develop the record on behalf of all claimants. *See Moran v. Astrue*, 569 F.3d 108, 112–13 (2d Cir. 2009). This means that the ALJ must investigate the facts and develop the arguments both for and against granting benefits. *Id.* Whether the ALJ has discharged this duty is a threshold question that must be addressed by the reviewing court before deciding whether the Commissioner's final decision is supported by substantial evidence pursuant to 42 U.S.C. § 405(g). *Scott v. Astrue*, No. 09-CV-3999 (KAM)(RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010). Remand is appropriate when the ALJ fails to discharge this duty. *See, Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

"[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5 (internal quotation marks and citation omitted). Moreover, an ALJ has no obligation to re-contact a treating source simply upon determining that the physician's opinion is inconsistent with the record. *See Micheli v. Astrue*, 501 F. App'x 26, 29–30 (2d Cir. 2012) (upholding denial of benefits where treating physician's assessments of plaintiff's impairments were inconsistent with the record).

Although Plaintiff does not expressly allege that the ALJ failed to fully develop the record, this Court is nevertheless obliged to conduct its own independent assessment of whether the ALJ properly discharged this duty. Here, this Court finds that ALJ Solomon complied with this requirement. Plaintiff had the opportunity to answer questions regarding his work and educational background, his activities of daily living, and the symptoms of his alleged impairments at two in-person hearings on September 15, 2014 (Tr. 27-76) and January 13, 2017. (*Id*. at 1060-1112.) With respect to medical opinion evidence, the record contains Dr. Tam's Report, which addresses Plaintiff's impairments from 2011 through 2016 (*Id*. at 1201-1205), as well as the opinions of four consultative mental health experts. (*Id*. at 493-69; 117-20, 122-25; 1172-75; 1093-95, 1097, and 1103.) The record also contains hundreds of pages of LICC Treatment Notes, spanning from 2011 through 2016. (*Id*. at 423-91, 512-726, 839-945, 947, 951-52, 978-79, 994, 1201-50.) The Notes reflect, among other things, Dr. Tam's and LMSW Fiskus's routine assessment of Plaintiff's mood and mental state, Plaintiff's reaction to various psycho-social stressors, and his response to psychotropic medications. (*See id.*) The

record also contains letters prepared by Dr. Tam and LMSW Fiskus regarding Plaintiff's ability to work  (*Id*. at 946, 948-50), and function reports prepared by Plaintiff (*id*. 301-11) and his wife. (*Id*. at 330-37.)

At the 2017 hearing, Plaintiff asked to keep the record open to allow him to submit two-and-a-half years of LICC Treatment Notes post-dating the date last insured.  (*Id*. at 1064, 1097-98.)  Those Notes are included in the record before this Court and were considered by the ALJ in rendering his decision.  Accordingly, after careful review of the full record, the Court is satisfied that the ALJ provided Plaintiff with a full hearing and completely developed the administrative record.

### B. *Treating Physician Rule*

Plaintiff argues that ALJ Solomon violated the treating physician rule by failing to ascribe significant weight to Dr. Tam's Report.  (Pl.'s Br. 11-18.)  Plaintiff further contends that the ALJ failed to properly analyze and weigh the opinions of Drs. Georgiou, Kushner, Shapiro, and Halperin.  (*Id*. at 18-22.)  The regulations in effect at the time Plaintiff filed his claim provide that the opinions of a claimant's treating physician are generally entitled to deference over those provided by non-medical sources and consultative examiners.[19]   Under those regulations, a treating physician's opinion as to a claimant's functional limitations that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record" is entitled to "controlling

---

[19] The "treating physician rule" has been eliminated, but remains applicable to claims filed before March 27, 2017. *Cortese v. Commissioner of Soc. Sec.*, No. 16-cv-4217 (RJS), 2017 WL 4311133, at *3 n.2 (S.D.N.Y. Sept. 27, 2017); *see also* Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p; Correction, SSR 96-2P, 2017 WL 3928297 (S.S.A. Apr. 6, 2017).

weight." § 404.1527(c)(2); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (the less

consistent a treating physician's opinion is with the record as a whole, the less weight it will be

given); SSR 96-2p, 2017 WL 3928297 (S.S.A. July 2, 1996) (providing guidance regarding the

treating physician rule).

There is an exception to the general rule, however.  A treating physician's opinion need

not be given controlling weight when it is contradicted by other substantial evidence in the

record.  *Bliss v. Commissioner of Soc. Sec.*, 406 F. App'x 541, 541–42 (2d Cir. 2011) (citing *Veino*

*v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)); *Snell*, 177 F.3d at 133 ("When other substantial

evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be

deemed controlling.  And the less consistent that opinion is with the record as a whole, the less

weight it will be given." (citing § 404.1527(d)(4))).  Moreover, a doctor's conclusion that a

claimant is "disabled" is not given "special significance," as that determination is reserved for

the Commissioner.  § 404.1527(d)(3); *see also Micheli*, 501 F. App'x at 28 ("[A] treating

physician's statement that the claimant is disabled cannot itself be determinative." (internal

quotation marks and citation omitted)).

If an ALJ declines to give controlling weight to a treating physician's opinion, he must

provide good reasons for doing so.  An ALJ also must evaluate the so-called "*Burgess* factors"

when determining the weight that should be attributed to a treating physician's opinion and

consider: "'(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of

medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining

medical evidence; and (4) whether the physician is a specialist.'"  *Estrella v. Berryhill*, 925 F.3d

90, 95–96 (2d Cir. 2019) (per curiam) (alteration in original) (quoting *Selian v. Astrue*, 708 F.3d

409, 418 (2d Cir. 2013)); *see also* § 404.1527(c).  However, an ALJ need not "slavish[ly] recit[e] .

. . each and every factor where the ALJ's reasoning and adherence to the regulation are clear."

*Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013); *see also Estrella*, 925 F.3d at 96 (An ALJ's

failure to expressly apply the four factors is a procedural error that can be excused only if a

"'searching review of the record'" demonstrates that the "'substance of the treating physician

rule was not traversed . . . .'" (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)).

Where a treating physician's opinion is not given controlling weight, the ALJ should also apply

the *Burgess* factors when determining the weight that should be afforded to the opinions

provided by non-treating sources.  *See Sottasante v. Colvin*, 209 F. Supp. 3d 578, 593 (W.D.N.Y.

2016) (noting that an ALJ must weigh the *Burgess* factors "in evaluating both treating and non-

treating source statements").

                i.  <u>Weight of Dr. Tam's Opinion</u>

Plaintiff contends that ALJ Solomon erred by ascribing only partial weight to Dr. Tam's

Report because he failed to expressly apply the *Burgess* factors.  As  to the first *Burgess* factor,

ALJ Solomon noted that Dr. Tam has treated Plaintiff since 2011.  (Tr. 1009.)  With respect to

the second factor, the ALJ noted that the LICC Treatment Notes show that Plaintiff suffers from

anxiety, depression, and "mini" auditory hallucinations, which improved over time and were

intermittently exacerbated by various psycho-social factors.  (*Id*. at 1020.)  With respect to the

third factor, ALJ Solomon found that the LICC Treatment Notes and Plaintiff's activities of daily

living contradicted Dr. Tam's Report and his finding that Plaintiff has marked mental

impairments.  The ALJ also declined to ascribe weight to Dr. Tam's conclusion that Plaintiff has

suffered from his purported mental impairments since November 1, 2009 because Dr. Tam had

no treating relationship with Plaintiff at that time.  However, as noted above, the ALJ, nonetheless, ascribed Dr. Tam's opinion partial weight from 2012 through 2017 and accepted some limitations that were consistent with his contemporaneous treatment notes.  (*Id*. at 1024.)  As to the fourth factor, the ALJ noted that Dr. Tam is a psychiatrist.  (*Id*. at 1019.) Accordingly, in light of the above, ALJ Solomon properly applied the *Burgess* factors and did not traverse the treating physician rule.

Plaintiff also maintains that ALJ Solomon misconstrued the LICC Treatment Notes when he determined that they contradict Dr. Tam's Report.  To support this assertion, Plaintiff speculates that the ALJ assumed that, because the Notes fail to pinpoint Plaintiff's specific functional limitations, they conclusively show that Plaintiff does not suffer from any significant impairments.  (Pl.'s Br. 12; *see also* Tr. 1024.)

As a threshold matter, it is well established that a treating source's conclusion that a claimant suffers from certain limitations may be entitled to less-than-controlling weight where the treating source's own notes fail to reflect such limitations.  *See Monroe v. Commissioner of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (declining to afford controlling weight to treating source statement finding that claimant's psychological impairments prevented her from staying on task for most of the work day and appropriately dealing with stress and the public, where the treatment notes described claimant's mood as "stable" or "good" and not suicidal and reflected that claimant engaged in a wide range of recreational activities); *Camille v. Colvin*, 652 F. App'x 25, 28 (2d Cir. 2016) (finding that substantial evidence supported giving limited weight to treating psychiatrist's opinion because the opinion conflicted with his own treatment notes); *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (declining to afford controlling weight to

treating source opinion stating that claimant suffered from moderate limitations due to bipolar disorder where the treatment notes indicated a few isolated instances of decompensation and showed that claimant's mental impairments were effectively managed through medication and therapy).

Plaintiff cites to *Richardson v. Astrue*, No. 09 Civ. 1841(SAS), 2009 WL 4793994 (S.D.N.Y. Dec. 14, 2009), but that case is inapposite to the case at bar. (Pl.'s Br. 12-13.) In *Richardson*, the court held that the ALJ disregarded the treating physician's notes that "clearly describe[d] a degeneration of Richardson's [psychiatric] condition beginning in 2006" to find that he was not disabled.[20] *Richardson*, 2009 WL 4793994 at *9. Here, in contrast to *Richardson*, the ALJ did not ignore the evidence in the record. Rather, he readily acknowledged Plaintiff's impairments throughout his opinion, specifically noting that Plaintiff suffers from depression, anxiety, and auditory hallucinations, and that these symptoms are sometimes exacerbated by various psycho-social factors. (Tr. 1019, 1024.) ALJ Solomon also carefully reviewed the LICC Treatment Notes and observed that Plaintiff's mood was typically "stable," that he engaged in a variety of activities and attended classes, and experienced no periods of decompensation or hospitalizations. (*Id*. at 1019, 1024.) As such, ALJ Solomon did not err by finding that the Notes show that Plaintiff's impairments do not rise to the level of severity described in Dr. Tam's Report. *See Nunez v. Colvin*, No. 15 Civ. 4957 (CS)(PED), 2017 WL 684228, at *13 (S.D.N.Y. Feb. 21, 2017) (discounting treating source's opinion that claimant suffered from severe limitations

---

[20] Plaintiff also cites to various cases from outside this Circuit, but those cases are not binding on this Court and are not analyzed here.

where, among other things, claimant's symptoms were typically stable, with some "exacerbation in the context of psycho-social stressors").

Plaintiff also argues that ALJ Solomon erred because he expressly rejected the "marked limitations" identified in Dr. Tam's Report, but did not expressly reject the "moderate-to-marked" or "moderate" limitations provided in the Report or explain why such limitations were rejected. (Pl.'s Br. 16-18.) Plaintiff mischaracterizes the ALJ's opinion. Indeed, on the same page cited by Plaintiff to make this argument, the ALJ stated that Plaintiff "*had at most moderate symptoms or limitations* during the period at issue, even when he reported symptoms of anxiety, depression, psychotic features, and a learning disorder." (Tr. 1024 (emphasis added).) As such, ALJ Solomon clearly rejected both the "marked" and "moderate-to-marked" limitations identified in Dr. Tam's Report because the record, and particularly the LICC Treatment Notes, show that the degree of Plaintiff's functional limitations are less severe than alleged in the Report.

Next, Plaintiff argues that the ALJ failed to incorporate any of the limitations identified in Dr. Tam's Report in Plaintiff's RFC or explain why such limitations were not adopted. (Pl.'s Br. 16-18.) Plaintiff is incorrect. ALJ Solomon clearly incorporated limitations in Plaintiff's RFC based on Plaintiff's ability to understand and remember, maintain concentration, persistence, and pace, appropriately interact with others, and adapt to the workplace environment by providing that Plaintiff should: avoid working at unprotected heights or with hazardous machinery; perform "simple repetitive rote work"; and have "only occasional close interpersonal contact with supervisors or coworkers, and no close interpersonal contact with the general public." (Tr. 1017; *see also id*. at 1204.) As explained at length above, ALJ Solomon

properly declined to adopt those portions of Dr. Tam's Report that are inconsistent with his treatment notes and Plaintiff's activities of daily living. *See* SSR 96-8p, 1996 WL 374184, (S.S.A. July 2, 1996) (requiring the ALJ to assess the extent of Plaintiff's mental limitations and explain why the opinion from a medical source was not adopted); *see also* 20 C.F.R. § 404.1545(c) (same).

Additionally, Plaintiff contends that ALJ Solomon erred by using Plaintiff's activities of daily living to discredit Dr. Tam's Report. This argument is unavailing because it is well established that an ALJ should consider a claimant's activities of daily living when determining how much weight should be afforded to a treating source's opinion. *See Browne v. Commissioner of Soc. Sec.*, 131 F. Supp. 3d 89, 99 (S.D.N.Y. 2015) (ALJ properly gave treating source opinion less-than-controlling weight where the opinion was inconsistent with plaintiff's activities of daily living). As such, the ALJ properly considered Plaintiff's wide range of activities of daily living, including "attending classes, travel[ing], look[ing] for an apartment, and car[ing] for a young child," to ascribe less weight to Dr. Tam's opinion. (Tr. 1024.)

Finally, ALJ Solomon entirely discounted the portion of Dr. Tam's Report stating that Plaintiff began suffering from his purported mental impairments in or about November of 2009. (*Id.*) Plaintiff correctly argues that the treating physician rule may apply to retrospective diagnoses. *See Martinez v. Massanari*, 242 F. Supp. 2d 372, 377 (S.D.N.Y. 2003) (first citing *Shaw v. Chater*, 221 F.3d 126, 134 (2nd Cir. 2000); then citing *Clark v. Commissioner of Soc. Security*, 143 F.3d 115, 118 (2nd Cir. 1998)). However, because Plaintiff alleged an onset date of November 17, 2012, this Court need not reach whether Dr. Tam's unsupported conclusion that Plaintiff began suffering from his impairments in 2009 is entitled to any weight. Indeed,

because Dr. Tam began treating Plaintiff in December of 2011, ample evidence pre-dating Plaintiff's purported onset date is included in the record. In light of the above, this Court finds that the ALJ did not commit reversible error by declining to consider Dr. Tam's opinion as to dates prior to the relevant DIB period and affording partial weight to Dr. Tam's Report with respect to the period during which he treated Plaintiff.

ii. Weight of Dr. Georgiou's Opinion

Plaintiff argues that the ALJ erred by affording the same weight to Dr. Georgiou's opinion as Dr. Tam's Report and failing to provide his rationale for adopting certain portions of Dr. Georgiou's opinion. These arguments are unavailing. Indeed, it is well established in this Circuit that a consultative examiner's opinion may be entitled to as much or greater weight than that of a treating source so long as it is consistent with the record. *See Rosier v. Colvin*, 586 F. App'x 756, 758 (2d Cir. 2014) (summary order) (declining to afford controlling weight to claimant's treating physician where the opinion was inconsistent with evidence in the record, including an evaluation by a consultative examiner); *Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995) (same); *Quintana v. Berryhill*, No. 1:18-cv-00561 (KHP), 2019 WL 1254663, at *17 (S.D.N.Y. Mar. 19, 2019) (citing *Jordan v. Commissioner of Soc. Sec.*, No. 16-cv-9634 (KHP), 2018 WL 1388527, at *9 (Mar. 19, 2018)) (noting that an ALJ may rely on the opinion of a consultative examiner where the consultative examiner's opinion is more consistent with the record as a whole than the treating source's opinion).

The cases cited by Plaintiff are readily distinguishable from the case at bar. For example, in *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013), the ALJ committed reversible error by ascribing greater weight to the opinion of a consultative examiner than the claimant's

treating physician where the consultative examination took place before the claimant's treating physician diagnosed him with fibromyalgia. Additionally, in *Selian*, the ALJ failed to reconcile these two contradictory opinions. Moreover, in *Karki v. Colvin*, No. 13-CV-06395 (SLT), 2017 WL 728225, at *16 (E.D.N.Y. Feb. 23, 2017), the ALJ erred by giving significant weight to the opinion of a one-time consultative examiner and failing to reconcile that opinion with the record and the opinions of three treating physicians, all of whom opined that the plaintiff could not perform sedentary work. *See also Cabreja v. Colvin*, No. 14-CV-4658 (VSB), 2015 WL 6503824, at *30 (S.D.N.Y. Oct. 27, 2015) (ALJ erroneously found that the treating source's opinion was unsupported by the record where the record was not fully developed); *Crespo v. Apfel*, No. 97 CIV 4777 (MGC), 1999 WL 144483, at *7 (S.D.N.Y. Mar. 17, 1999) (opinions of consultative examiners not entitled to greater weight than those of claimant's treating physicians, which were consistent with the record as a whole).

In contrast to the cases cited by Plaintiff, here, ALJ Solomon properly evaluated Dr. Georgiou's opinion by reconciling her findings with the record as a whole. The ALJ also explained the rationale behind his decision to ascribe partial weight to Dr. Georgiou's opinion by applying the *Burgess* factors and noting that: (1) She only examined Plaintiff once; (2) her evaluation "yielded substantially normal findings"; (3) Plaintiff has certain "proven limitations," *i.e.*, limitations supported by the record, and the evaluation results show that Plaintiff may experience "difficulty performing complex tasks and dealing appropriately with stress"; and (4) Dr. Georgiou is a psychologist. (Tr. 1023); *see Estrella*, 925 F.3d at 94. As such, the ALJ properly evaluated Dr. Georgiou's opinion pursuant to the *Burgess* factors. Accordingly, because the ALJ adopted the portions of Dr. Georgiou's evaluation that were consistent with the record as a

whole and explained his rationale for doing so pursuant to the *Burgess* factors, he did not

commit reversible error in weighing her opinion.

### iii.  Weight of Dr. Shapiro's Opinion

In a single sentence, the ALJ gave partial weight to the opinion of Dr. Shapiro, a non-

examining source, to the extent it supported Plaintiff's ability to perform "simple unskilled work

during the period at issue," *i.e.*, from November 17, 2012 through June 30, 2014.  (Tr. 1023.)

Plaintiff argues that Dr. Shapiro's opinion should not have been afforded any weight because

Dr. Shapiro did not examine Plaintiff and only reviewed the LICC Treatment Notes for January of

2012 through January 11, 2013.  (Pl.'s Br. 19-20.)  The Commissioner, on the other hand, argues

that Dr. Shapiro's assessment was supported by substantial evidence in the record, including

Dr. Georgiou's assessment, the LICC Treatment Notes, and Plaintiff's self-reported activities of

daily living.  (Def.'s Br. 15-18.)

To start, the cases cited by Plaintiff are inapposite.  For example, in *Burgess v. Astrue*,

537 F.3d 117, 132 (2d Cir. 2008), the court found that the ALJ committed reversible error by

using medical reports prepared by non-examining consultants to rebut the treating source's

opinion where the non-examining consultants failed to review a critical MRI.  Likewise, in

*Green-Younger v. Barnhart*, 335 F.3d 99, 107–108 (2d Cir. 2003), the ALJ erred by concluding

that the claimant was not disabled by relying on reports prepared by two non-examining

sources where one source mischaracterized the claimant's purported impairments and the

other relied on an evaluation prepared by a physical therapist.  *See also Vargas v. Sullivan*, 898

F.2d 293, 295 (2d Cir. 1990) (ALJ erred by relying on non-examining source's testimony that was

inconsistent with the record and claimant's activities of daily living); *Brown v. Commissioner of*

*Soc. Sec.*, No. 06-CV-3174 (ENV) (MDG), 2011 WL 1004696, at *5 (E.D.N.Y. Mar. 18, 2011) (ALJ erred by relying on opinion of non-examining source who based his opinion on lack of evidence in the record); *Valerio v. Commissioner of Soc. Sec.*, No. 08-CV-4253 (CPS), 2009 WL 2424211, at *13 (E.D.N.Y. Aug. 6, 2009) (non-examining source's opinion should not have been used to contradict the treating physician's opinion where, among other things, the source failed to review a crucial X-ray).

Here, the ALJ did not use Dr. Shapiro's opinion to contradict Dr. Tam's Report, nor did he significantly rely on the opinion to assess Plaintiff's RFC. (Tr. 1023.) Rather, the ALJ merely adopted the portion of Dr. Shapiro's opinion that was consistent with the record. This is consistent with the case law in this Circuit, which provides that an ALJ is entitled to rely on the opinions of "both examining and non-examining State agency medical consultants, since such consultants are deemed qualified experts in the field of social security disability." *Burch v. Commissioner of Soc. Sec.*, No. 1:15-cv-9350 (GHW), 2017 WL 1184294, at *12 (S.D.N.Y. Mar. 29, 2017) (internal quotation marks and citation omitted), *appeal dismissed* (July 5, 2017).

The governing regulation also expressly provides that the opinions of non-examining sources constitute opinion evidence and the weight afforded to such opinions should be based on the "degree to which they provide supporting explanations for their opinions." 20 C.F.R. § 404.1527(c)(3). Here, Dr. Shapiro justified his or her opinion by citing to the record, which shows that: Plaintiff is able to take public transportation and cook simple meals; has mild impairments with respect to his memory, as shown by his inability to recall and reverse numbers; has moderate impairments with respect to his ability to deal with the general public due to his "dysthymic mood"; and has moderate limitations with respect to his ability to set

realistic goals and make plans independently of others. (Tr. 124-125.) Additionally, Dr. Shapiro noted that Plaintiff has not been hospitalized due to his mental impairments and that, although Plaintiff had some suicidal thoughts around the time of his mother's death, he did not have plans to hurt himself. (*Id*. at 125.) Finally, Dr. Shapiro acknowledged that Plaintiff has experienced some mild auditory hallucinations and depression and that his cognitive functioning is average. (*Id*.) Although it may be true that Dr. Shapiro did not review all of the LICC Treatment Notes that were available in February of 2014, this oversight did not require the ALJ to reject Dr. Shapiro's opinion outright because the Treatment Notes Dr. Shapiro did review were consistent with the record that existed at the time he or she conducted the evaluation.

Although neither party raised this issue, the Court notes that the ALJ did not expressly consider the *Burgess* factors in weighing Dr. Shapiro's opinion. Nevertheless, this Court finds that the ALJ did not violate the substance of the rule because, as explained above, it is clear that the ALJ evaluated Dr. Shapiro's opinion in light of the record that existed at the time Dr. Shapiro rendered his or her opinion and found that the opinion was sufficiently consistent with the record to merit some weight. (*Id*. at 1023); *see also Estrella*, 925 F.3d at 96. Thus, in light of the above, this Court finds that ALJ Solomon did not commit reversible error by ascribing partial weight to Dr. Shapiro's opinion.

### iv. Weight of Dr. Kushner's Opinion

ALJ Solomon gave little weight to the October 2016 report by consultative psychologist Dr. Kushner because it was based on a one-time evaluation conducted more than two years after Plaintiff's last-insured date. (Tr. 1023.) Plaintiff argues that the ALJ improperly discounted this opinion simply because it was conducted after Plaintiff's date last insured. The crux of

Plaintiff's argument is that if the ALJ knew he was going to discount Dr. Kushner's opinion, he should not have ordered the examination in the first place. (Pl.'s Br. 21.) This Court is unaware of any case law that supports this position and Plaintiff cites to none. Moreover, at least one court in this Circuit has held that a one-time examination taking place after the date last insured is entitled to little weight where the examiner's opinion is based on his contemporaneous examination of the claimant and is inconsistent with the record. *See Winder v. Berryhill*, 369 F. Supp. 3d 450, 459 (E.D.N.Y. 2019); *see also Mix v. Astrue*, No. 09-CV-0016, 2010 WL 2545775, at *7 (W.D.N.Y. June 18, 2010) (discounting examination conducted by treating physician after the date last insured where the results of the examination contradicted evidence in the record from the relevant period). In any event, the questionnaire completed by Dr. Kushner expressly provides that the assessment contained in the questionnaire pertains to "current limitations only." (Tr. 1177.)

With respect to the *Burgess* factors, the ALJ noted that: (1) Dr. Kushner examined Plaintiff once and (2) he is a psychologist. (*Id*. at 1023.) Although the ALJ did not consider the amount of medical evidence supporting Dr. Kushner's opinion or the consistency of his opinion with the record as a whole, this oversight constitutes harmless error. Indeed, as explained above, because Dr. Kushner conducted his examination approximately two years after Plaintiff's date last insured and his examination was limited to evaluating the severity of Plaintiff's impairments at the time of the examination, Dr. Kushner's opinion would not have been entitled to greater weight even if it had been consistent with the record and supported by substantial evidence. *See Estrella*, 925 F.3d at 94. Accordingly, because Dr. Kushner's examination occurred well after Plaintiff's date last insured and only assessed Plaintiff's

limitations as of October of 2016, ALJ Solomon did not err by discounting Dr. Kushner's opinion.[21]

v.   Weight of Dr. Halperin's Opinion

Plaintiff argues that the ALJ erred by giving little weight to Dr. Halperin's opinion because the ALJ failed to provide Dr. Halperin with psychiatric records prepared in the latter half of 2014 through January of 2017.  (Pl.'s Br. 21-22.)  Plaintiff's argument is unavailing for several reasons.

First, ALJ Solomon gave little weight to Dr. Halperin's opinion that Plaintiff's impairments meet the criteria of Listing 12.04 because the opinion was "grossly disproportionate to the actual treatment notes and [Plaintiff's] demonstrable ability to function on a daily basis."  (Tr. 1022.)  Specifically, the ALJ found that, contrary to Dr. Halperin's testimony: there is no diagnosis of schizophrenia in the record for the period at issue; to the extent Plaintiff has suffered from auditory hallucinations since childhood, he was, nonetheless, able to maintain a job until 2009; the LICC Treatment Notes show that Plaintiff's auditory hallucinations are controlled with medication; and the record is devoid of documentation showing that Plaintiff was ever psychotic or has difficulty concentrating.  (*Id.*)

Second, because the missing treatment records did not pertain to the time period at issue, those records were not essential to Dr. Halperin's assessment of Plaintiff's impairments during the relevant period.  Indeed, and as the record makes clear, Dr. Halperin was able to review ample documentation from the time period at issue in order to render his opinion.

---

[21]Plaintiff also contends that the Commissioner waived its right to argue that the ALJ appropriately weighed Dr. Kushner's opinion by not addressing this issue in its Opposition Brief and that remand is required on this basis. (Pl.'s Reply 3.)  Plaintiff cites to no case law to support this position and this Court is aware of none.  Accordingly, the Court rejects this argument.

Third, because Dr. Halperin opined that Plaintiff meets the requirements of Listing 12.04 and is, thus, disabled, providing him with additional documents would not have significantly changed his diagnosis. Finally, Plaintiff appears to suggest that the ALJ improperly afforded little weight to Dr. Halperin's opinion because he was not provided with the full record. (Pl.'s Br. 21-22.) However, as made clear in the ALJ's opinion, the ALJ declined to afford Dr. Halperin's opinion significant weight because it could not be reconciled with the record.

As demonstrated by the analysis above, ALJ Solomon properly evaluated Dr. Halperin's testimony pursuant to the *Burgess* factors by noting that: (1) Dr. Halperin is not a treating source; (2) his opinion, that Plaintiff meets Listing 12.04 and has diagnosed schizophrenia, is unsupported by the record; (3) his opinion was, in general, "grossly disproportionate" with the record; and (4) he is a psychiatrist. (Tr. 1012, 1022.) Thus, in light of the above, the ALJ did not commit reversible error by ascribing little weight to Dr. Halperin's opinion.

### C. Plaintiff's Subjective Complaints

Plaintiff alleges that ALJ Solomon failed to properly evaluate his subjective complaints regarding his symptoms. (Pl.'s Br. 22-25.) However, it is well established that an ALJ "'is not required to accept the claimant's subjective complaints without question . . . [and] may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" *Martes v. Commissioner of Soc. Sec.*, 344 F. Supp. 3d 750, 763 (S.D.N.Y. 2018) (quoting *Barry v. Colvin*, 606 F. App'x 621, 622 (2d Cir. 2015)) (although claimant suffered ongoing pain, such pain did not prevent him from performing sedentary work). An ALJ must apply a two-step process to determine whether a claimant is accurately describing the severity of symptoms caused by a medical condition or impairment. First, the ALJ must determine

whether the claimant, in fact, suffers from an underlying medical condition or impairment. Second, the ALJ must determine whether such a condition or impairment could reasonably be expected to cause the symptoms alleged. *See* 20 C.F.R. § 404.1529; SSR 16-3P, 2016 WL 1119029 (S.S.A. Mar. 16, 2016).[22]

When assessing the existence and severity of symptoms arising from the claimant's underlying medical condition or impairment, applicable regulations state that an ALJ should inquire about various factors, including: the claimant's daily activities; intensity and persistence of pain and other symptoms; the factors that aggravate the claimant's symptoms; and the treatments and medications used to alleviate those symptoms. § 404.1529; *see also* SSR 16-3P, 2016 WL 1119029 (S.S.A. Mar. 16, 2016). An ALJ must explain a decision to reject a claimant's testimony about his limitations "'with sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence.'" *Bracken v. Colvin*, No. 1:16-cv-9488 (LTS) (KHP), 2017 WL 5999952, at *12 (S.D.N.Y. Sept. 19, 2017) (alteration in original) (quoting *Calzada v. Astrue*, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010)), *adopted by* No. 1:16-cv-9488 (LTS) (KHP), 2017 WL 6001846 (S.D.N.Y. Dec. 4, 2017). "'It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.'" *Martes*, 344 F. Supp. 3d at 750 (alteration in original) (quoting *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)).

---

[22] SSR 16-3P was superseded by SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017), which eliminated the use of the term "credibility" and clarified that, in examining a claimant's symptoms, an ALJ is not evaluating the claimant's character.

Where an ALJ's evaluation of the severity of a claimant's symptoms is supported by substantial evidence in the record, that finding should be upheld. *See Smalls v. Colvin*, No. 1:16-cv-1717 (PAE)(KHP), 2017 WL 1250832, at *16 (S.D.N.Y. Mar. 15, 2017) (ALJ properly found that claimant's testimony regarding her symptoms was not entirely accurate where claimant testified that "she often gets panic attacks, . . . side effects from her medications, and . . . left her last job due to conflicts [at work]," yet treatment notes in the record showed that "she can maintain attention and concentration for performing rote work because she successfully completed her G.E.D."), *adopted by* No. 1:16-cv-1717 (PAE)(KHP), 2017 WL 1274218 (S.D.N.Y. Apr. 4, 2017); *see also Bracken*, 2017 WL 5999952, at *12 (ALJ properly assessed the severity of claimant's symptoms where he "contrasted Plaintiff's subjective complaints with her treatment history and evidence in the record, and properly noted that objective and clinical findings did not support the complaints and functional limitations to the extent alleged . . . ."); *Thompson v. Colvin*, No. 12 Civ. 7024(PAE)(HBP), 2014 WL 7392889, at *21 (S.D.N.Y. Dec. 29, 2014) (claimant's testimony regarding symptoms arising from paranoia, auditory hallucinations, and anxiety did not accurately represent the severity of those symptoms where claimant was able to perform daily activities, including chores, caring for his personal hygiene and taking public transportation, and "his mental status examinations were 'consistently in normal limits,' and showed that plaintiff did not suffer from any impairment in judgment or impulse control, illogical or psychotic thought processes, concentration, memory or attention").

Here, ALJ Solomon followed the two-step process required by the applicable Social Security Act regulations. First, he found that Plaintiff's "medically determinable impairments could reasonably be expected to produce the . . . alleged symptoms . . . ." (Tr. 1020.) Second,

he concluded that Plaintiff's symptoms "are not entirely consistent with the medical evidence and other evidence in the record." (*Id.*) Specifically, ALJ Solomon noted that Plaintiff's treatment was conservative and consisted of psychotropic medication and regular 20 minute sessions with Dr. Tam and LMSW Fiskus. He also observed that Plaintiff was not hospitalized due to his mental impairments and did not require emergency room care. (*Id.* at 1021.) The ALJ also cited to Plaintiff's activities of daily living, including the fact that he cares for his young daughters while his wife works, took GED classes, and traveled to the Dominican Republic by himself to pursue his inheritance rights. (*Id.*) Additionally, ALJ Solomon considered the various psycho-social stressors that aggravate Plaintiff's symptoms as well as Plaintiff's testimony regarding the persistence and pace of his symptoms, both of which are discussed at length above. With respect to the side effects caused by his medications, Plaintiff testified at the 2015 and 2017 hearings that he only suffers from certain sexual side effects when taking his medication. (*Id.* at 102-103, 1075-75.) As such, the ALJ evaluated Plaintiff's subjective complaints pursuant to the applicable regulations. *See* 20 C.F.R. § 404.1529; *see also* SSR 16-3P, 2016 WL 1119029 (S.S.A. Mar. 16, 2016).

Plaintiff makes the bare assertion that "Plaintiff's activities of daily living are not inconsistent with a finding of disability." (Pl.'s Br. 23.) This argument is unavailing because, as explained above, an ALJ has the discretion to weigh a claimant's activities of daily living against his testimony to determine the accuracy of that testimony. *See Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (ALJ properly discounted plaintiff's subjective complaints based on daily activities); *Wolfe v. Commissioner of Soc. Sec.*, 272 F. App'x 21, 22 (2d Cir. 2008) (same); *Donnelly v. Barnhart*, 105 F. App'x 306, 308 (2d Cir. 2004) (same).

Plaintiff also contends that the ALJ traversed the requirements of 20 C.F.R. § 404.1529(c)(2), which provides that a claimant's allegations cannot be rejected "solely because the available objective medical evidence does not substantiate [the claimant's] statements." (Pl.'s Br. 24.) This argument is without merit because, as previously explained, the ALJ considered both the medical evidence in the record and Plaintiff's activities of daily living to ascertain whether his testimony was accurate.

Plaintiff further maintains that the ALJ erred by characterizing his treatment as conservative and appears to argue that the prescription of psychotropic medication, alone, demonstrates that Plaintiff's course of treatment is not conservative. (*Id.*) In particular, Plaintiff claims that Risperdal does not constitute conservative treatment because it has the potential to have deleterious and irreversible side effects. (*Id*. at 24-25.) Plaintiff's argument is without merit. First, Plaintiff has not alleged that he suffered from any severe side effects due to taking Risperdal or any other medication. (*See* Def.'s Br. 24; *see also* Tr. 102-103, 1074-75.) Moreover, courts in this Circuit have found that claimants who take Risperdal or other psychotropic medications are not necessarily disabled. *See Brown v. Comm'r of Soc. Sec.*, No. 13 Civ. 827(JMF)(GWG), 2014 WL 783565 (S.D.N.Y. Feb. 28, 2014) (finding that claimant who was taking Risperdal was not disabled); *see also Thompson v. Colvin*, No. 12 Civ. 7024(PAE)(HBP), 2014 WL 7392889, at *8 (S.D.N.Y. Dec. 29, 2014) (claimant who was taking psychotropic medication to treat his auditory hallucinations was not disabled).

In sum, the ALJ did not ignore Plaintiff's subjective complaints. Rather, he reconciled those complaints with the record as a whole and incorporated them into Plaintiff's RFC. (Tr.

1021.)  Accordingly, this Court is satisfied that the ALJ properly evaluated Plaintiff's subjective complaints.

### D.  Substantial Evidence

Having addressed Plaintiff's main arguments, the Court briefly addresses whether the ALJ's decision is supported by substantial evidence.  Plaintiff contends that ALJ Solomon failed to identify substantial evidence supporting his determination of Plaintiff's RFC.  (Pl.'s Br. 18.)  However, substantial evidence in the record does support the ALJ's finding that Plaintiff can perform light, rote work that requires only occasional close interpersonal contact with supervisors or coworkers, and no close contact with the general public.  (Tr. 1017.)  As explained above, ALJ Solomon pointed to, and the record contains, substantial evidence supporting that RFC determination.

Substantial evidence means something less than a preponderance of the evidence — that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).  This Court is sympathetic to Plaintiff's situation, but under applicable law, even if this Court might have reached a different decision because substantial evidence exists to find disability, it is not the function of this Court to re-weigh the evidence or disturb the Commissioner's decision if substantial evidence also exists in support of the Commissioner's decision finding no disability.  *See Quinones ex rel. Quinones v. Chate*r, 117 F.3d 29, 36 (2d Cir. 1997); *Jones v. Sullivan*, 949 F.2d 57, 61 (2d Cir. 1991).  Remand or an award of benefits is appropriate only when the totality of the record would compel a fair-minded person to conclude that the claimant cannot work.  *See Singletary v. Secretary of Health, Ed. and Welfare*, 623 F.2d 217 (2d Cir. 1980). The

record as a whole does not lead this Court to such a conclusion.  Here, substantial medical evidence supports the ALJ's RFC determination.  The LICC Treatment Notes, for example, show that Plaintiff's symptoms generally improved with medication and cognitive therapy. Additionally, Dr. Georgiou's and Dr. Shapiro's opinions reflect that, although Plaintiff suffers from some psychological limitations, he is, nevertheless, able to perform some work. Plaintiff's work history and his own descriptions of his activities also weigh in favor of the ALJ's RFC determination.  Indeed, the record shows that: although Plaintiff allegedly began experiencing auditory hallucinations as a child, he worked for well over a decade until he was let go as part of a group lay off; he takes care of his young children while his wife is at work, which includes taking them to the park and bringing his elder daughter to and from school; he traveled to his mother's funeral in the Dominican Republic by himself and hired a lawyer to pursue his inheritance rights; and he participated in the "WeCare Fedcap" Program in 2013.  *See supra*. The record also shows that Plaintiff enrolled in GED and computer classes in order to become more competitive in the job market, and attended classes five days a week for an extended period of time.  Although Plaintiff did not obtain his GED, it is notable that Plaintiff was, nevertheless, able to improve his reading and math skills through his persistence and commitment to improving these skills.

As the record makes clear, ALJ Solomon did not ignore evidence in favor of Plaintiff's claim.  He analyzed Dr. Tam's Report, which stated that Plaintiff suffers from certain moderate-to-marked and marked limitations.  (Tr. 1201-1205.)  He also closely reviewed the LICC Treatment Notes and considered Plaintiff's subjective complaints and acknowledged that Plaintiff sometimes reported suffering from depression, anxiety, and auditory hallucinations in

connection with various psycho-social stressors.  The ALJ was entitled to weigh the evidence in the record to arrive to his conclusion.  And, in a nod to some of the limitations and symptoms Plaintiff reported, the ALJ added additional limitations to Plaintiff's RFC determination to accommodate his mental impairments.  These additional limitations include that Plaintiff must: avoid working at unprotected heights or with hazardous machinery; perform "simple repetitive rote work; and have "only occasional close interpersonal contact with supervisors or coworkers, and no close interpersonal contact with the general public."  (*Id*. at 1017; *see also id*. at 1204.) As such, the Court is satisfied that the ALJ weighed the evidence before him as a whole when making his final RFC determination.

Having determined Plaintiff's RFC, the burden shifts to the Commissioner to show that sufficient jobs exist in the national economy that an individual with the claimant's RFC would be able to perform.  *See* 20 C.F.R. § 404.1566. The Second Circuit has held that a vocational expert's testimony may constitute substantial evidence that sufficient jobs exist in the national economy that the claimant can perform, *Galiotti v. Astrue*, 266 F. App'x 66, 68 (2d Cir. 2008), and that an ALJ can reasonably rely on a vocational expert's testimony so long as it is not undermined by evidence in the record.  *See Wright v. Colvin*, 99 F. Supp. 3d 328, 339 (E.D.N.Y. 2015) (ALJ correctly relied on vocational expert's testimony that sufficient numbers of jobs exist that can be performed by individuals who can only perform *"*simple, routine, repetitive work with limited contact with coworkers and none with the public").

At the hearing, ALJ Solomon asked the vocational expert whether sufficient light and sedentary exertion-level jobs exist in the national economy that an individual with Plaintiff's RFC could perform, with added limitations to accommodate his mental impairments.  (Tr. 1106-

1107.)  The vocational expert testified that an individual with Plaintiff's RFC, considering his age, education, and skills, could perform many jobs, including: marker (DOT No. 209.587-034); routing clerk (DOT No. 222.687-022); office helper (DOT No. 239.567-010); addresser (DOT No. 209.587-01); assembler (DOT No. 734.687-018); table worker (DOT. No. 739.687-182); and stuffer (No. 731.685-014).  (*Id*. at 1107-1109.)  Plaintiff did not object to, and no evidence in the record undermines, the vocational expert's testimony.  Therefore, the vocational expert's assessment constitutes substantial evidence that supports the ALJ's determination that Plaintiff is not disabled and there are jobs in the national economy that he can perform notwithstanding his limitations.

## CONCLUSION

For the foregoing reasons, the Commissioner's Motion is GRANTED and Plaintiff's Motion is DENIED.

Dated: August 26, 2019
      New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge